**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **KENNETH A. BAKER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case number 1:05cv0178 TCM** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,[1]** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying the applications of

Kenneth A. Baker for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits

("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b, is before the Court[2] for a final

disposition. Mr. Baker ("Plaintiff") has filed a brief in support of his complaint; the

Commissioner has filed a brief in support of his answer.

## Procedural History

Alleging a disability since September 28, 1999, caused by bronchitis, asthma,

emphysema, severe headaches, back problems, and diabetes, Plaintiff applied in August 2004

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

for DIB and SSI.[3] His applications were denied following a hearing held in June 2005 before Administrative Law Judge ("ALJ") Julian Cosentino. (R. at 13-52, 76-80, 83, 117-21.[4]) The Appeals Council then denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 4-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff testified that he was born on April 21, 1959, and was then 46 years' old. (Id. at 28.) He was 5 feet 7 inches tall and weighed 225 pounds. (Id.) He had "maybe" finished the tenth grade. (Id.) He usually lived by himself and sometimes with his brother. (Id. at 36.) His brother was also disabled. (Id. at 37.) Plaintiff had a 27-year old son, but had seen him only three times since he was born. (Id. at 37, 39-40.)

Plaintiff last worked for two weeks in 2000, pulling giblets for Tyson Foods. (Id. at 29.) Before that, he worked as a mechanic for a bowling alley from 1993 to 1999. (Id.) He stopped working there when the alley was sold. (Id. at 30.) The new owner took away the employees' vacation time. (Id.) And, his boss had told him the new employer would require more physically-demanding tasks. (Id. at 30, 31.) He had also worked as a dishwasher and a furniture mover. (Id. at 29.) He had worked with his father moving furniture until his

[3]The ALJ notes in his decision that Plaintiff had previously applied for DIB and SSI. Those applications had been denied in May 2004 following an administrative hearing before an ALJ.

[4]References to "R." are to the administrative record filed by the Commissioner with his answer.

father's death.  (<u>Id.</u> at 30-31.)  It was after this job had ended that his health had begun deteriorating.  (<u>Id.</u> at 30.)

In addition to problems with his back, Plaintiff had problems with his left knee.  (<u>Id.</u> at 32.)  He had tried to get his medical records from his former doctor, Darren Merritt,[5] but had not been able to contact him.  (<u>Id.</u>)  Plaintiff also had high blood pressure, diabetes, sleep apnea, depression, chronic obstructive pulmonary disease ("COPD"), and headaches.  (<u>Id.</u> at 32.)  He took Glucophage for diabetes and Atacand for blood pressure.  (<u>Id.</u> at 34.)  He used a continuous positive airway pressure ("CPAP") machine for the sleep apnea.  (<u>Id.</u>)  Dr. Merritt had told him he had COPD.  (<u>Id.</u> at 35.)  For the COPD, he used Albuterol, an inhaler, and an oxygen tank.  (<u>Id.</u> at 35, 45.)  The latter he used in the summer.  (<u>Id.</u> at 45.)  Also, he took Lorcet four times a day for pain.  (<u>Id.</u> at 42.)

He had once been hospitalized for a hernia.  (<u>Id.</u> at 36.

Plaintiff was currently being treated by Dr. Jalal.  (<u>Id.</u> at 33.)

Asked what he did during the day, Plaintiff replied that he did not do much.  (<u>Id.</u> at 38.)  He made sandwiches or used the microwave.  (<u>Id.</u>)  When he stays with his brother, his brother and his niece usually do the sweeping and vacuuming.  (<u>Id.</u>)  He can drive, but lost his license in 1978 for drinking and has not renewed it.  (<u>Id.</u> at 39.)

Plaintiff can not walk for longer than 30 minutes or stand for longer than 20 minutes.  (<u>Id.</u> at 41.)  His back, knees, and neck hurt if he does either for any longer.  (<u>Id.</u> at 41-42.)

_____

[5]The hearing transcript refers to a Dr. "Merit."  The Court will use the spelling employed in the medical records, "Merritt."

His hands are constantly cramped from arthritis.  (Id. at 42.)  To relieve discomfort, he lies down or sits in a recliner with his feet up.  (Id. at 42.)  Two or three times a month, he blacks out.  (Id. at 43.)  He has coughing spells caused by heat and humidity, being out of breath, or doing any type of strenuous work.  (Id. at 43-44.)  He sometimes has chest pains with the coughing spells.  (Id. at 44.)

Plaintiff has difficulty with his hands cramping when he tries to write.  (Id. at 45.) He cannot spell well.  (Id.)

Mr. Magrowski testified as a vocational expert ("VE").  (Id. at 47.)  He had reviewed Plaintiff's file and had heard his testimony.  (Id.)  The ALJ asked the VE to assume that Plaintiff could occasionally lift 20 pounds, could frequently lift 10 pounds or less, and could not stay in a sitting position for longer than 30 minutes without having to change positions. (Id.)  Asked if there were jobs such a person could perform, the VE replied, "[y]es."  (Id. at 47-48.)  There were packing jobs, stuffing jobs, and simple assembly jobs.  (Id. at 48.)  Such jobs existed in significant numbers in the state and national economy.  (Id.)  Some unskilled, cashiering jobs also permitted a sit and stand option.  (Id.)  If a person with such restrictions also had to avoid concentrated, polluted environments, he could perform those jobs.  (Id. at 49-50.)

If Plaintiff also had to lie down during the day, requiring that he sometimes leave the workstation, sometimes for the better part of the workday, there were no jobs that he could perform.  (Id. at 49.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, and medical records.

In September 2004, when applying for DIB and SSI, Plaintiff completed a "Function Report." (Id. at 181-181-88.) He reported that he lived in an apartment with his family. (Id. at 181.) During the day, because of his back pain, he lies on a couch or sits in a chair. (Id.) He uses his oxygen most of the day. (Id.) At approximately noon, he heats a pot pie in the oven; in the evening, he warms a frozen dinner. (Id.) He goes to sleep around 10 or 11 o'clock at night. (Id.) His impairments make it hard for him to breathe, walk, stand, or move as well as he formerly could. (Id.) He has difficulty getting dressed because he runs out of breath and bathing because he cannot stand for long. (Id.) He does not do any chores because his back and left knee hurt. (Id. at 183.) Because of his depression, he no longer has any hobbies or other interests. (Id. at 185.) He does not socialize with anyone and has problems getting along with anyone other than his mother and brother. (Id. at 185-86.) He can only lift less than 10 pounds and walk less than 50 yards. (Id. at 186.) He sometimes has difficulty finishing what he starts. (Id.) He wears glasses and uses a cane and back brace. (Id. at 187.)

On a separate report, Plaintiff listed two former employers, both in Michigan. (Id. at 136, 142.) He worked packing and moving furniture for Corrigan Moving Company from 1991 to 1993 and rebuilding machines and doing other work for Town and Country Lanes form 1993 to January 19, 1999. (Id. at 136.) On another report, Plaintiff listed an additional

job as a dishwasher from 1989 to 1992.  (Id. at 189.)  Plaintiff had earnings from 1976 through 1982, inclusive, 1984, 1987, and 1989 through 2000, inclusive. (Id. at 122.)  In only four of those twenty-one years, was his annual income in excess of $10,000.00.  (Id.)  His highest annual earning were $14,317.88, in 1997.  (Id.)  His last reported earnings were $446.71, in 2000.  (Id.)

A few months later, in November 2004, Plaintiff completed a "Disability Report," reporting that his back, knees, and breathing were all getting worse.  (Id. at 146.)  He was 45 years' old and felt like he was 65.  (Id.)  He would try to walk around a block, but could not because of pain in his back and knees and difficulty breathing.  (Id.)  On a separate form, completed a month earlier, Plaintiff reported that he was taking 11 different prescription medications.  (Id. at 153-54.)

Plaintiff reported in May 2005 that he had taken a pulmonary function test; the results were worse than the ones before.  (Id. at 133.)  His recent medications included Lorcet, Advair, Albuterol, Flonase, Glucophage, Atacand, Skelaxin, and Sonata. (Id. at 134-35, 138-40.)  Each had been prescribed by Dr. Jalal.  (Id.)  He saw Dr. Jalal once or twice a month. (Id. at 141.)

With one exception – a chest x-ray showing no active cardiopulmonary disease – only those medical records of Plaintiff's treatment with Reza T. Jalal, M.D., and related tests were before the ALJ.

Plaintiff first saw Dr. Jalal on October 9, 2003.  (Id. at 224-25.)  Dr. Jalal reported that Plaintiff had been seeing Dr. Merritt for his back problems and needed to get established

as a new patient.  (Id. at 224.)  After noting his history of back and left knee pain, Dr. Jalal

further noted that Plaintiff had not had any radiologic evaluation of his back and had never

been checked for cholesterol or type 2 diabetes.  (Id.)  His latest pulmonary function test

("PFT") was 18 to 24 months before.  (Id.)  Dr. Jalal concluded as follows:

> 1. Hypertension, adequately controlled.  Patient advised to continue on same
> regime [sic] for now.  Patient advised to have blood work . . . before follow
> up.
>
> 2.  Asthmatic bronchitis with COPD.  Obtain x-ray and PFT report from
> hospital for review.  Continue on Advair, Singulair regime [sic] for now with
> [as needed] use of albuterol.  Strongly advocated patient to give up cigarette
> smoking.[6]
>
> 3.  OSA [obstructive sleep apnea] very likely in this middle age gentleman
> who has poorly controlled blood pressure who is obese and does have multiple
> risk factors include [sic] excessive daytime fatigue and sleepiness with
> irritability and early morning headaches.  We'll set up patient for sleep study.
>
> 4. Chronic low back pain.  Obtain MRI of lumbar spine for evaluation.  Also
> obtain x-ray of the left knee . . .  Ultracet PO tid [twice a day] for pain relief
> along with Flexeril every 8 hours for muscle spasm advised in the meanwhile.
>
> 5.  Allergic rhinitis.  Continue on regime [sic] of Flonase with Singulair
> without any change.
>
> 6. History of major depression.  Patient is on Serzone . . . with stable control
> of some of his symptoms.  Certainly depression and irritability can remain
> uncontrolled when you have untreated sleep apnea. . . .

(Id. at 225.)  An x-ray of his left knee revealed a tiny osteophyte posterior patella without

significant patellofemoral joint narrowing.  (Id. at 234.)  A magnetic resonance imaging

("MRI") scan of his lumbar spine revealed a mild L4-L5 bilateral neuroforaminal narrowing

---

[6]Plaintiff had informed Dr. Jalal that he smoked more than 40 packs of cigarettes a year.

secondary to bulging disc and facet hypertrophy, otherwise normal lower lumbar degenerative disc disease, and facet arthropathy without additional foraminal stenosis. (<u>Id.</u> at 235-36.) Two weeks later, Plaintiff reported that the Ultracet was not alleviating the back pain, which was a seven on a scale of one to ten, with ten being the worst. (<u>Id.</u> at 223.) He was advised to continue with the Flexeril; Lorcet was added for pain relief. (<u>Id.</u>) He was also advised that his recent blood work was "suspicious" for diabetes mellitus. (<u>Id.</u>) He was advised to have a different test done. (<u>Id.</u>)

The next month, Plaintiff reported that his low back pain was "markedly improved" on the Lorcet. (<u>Id.</u> at 222.) The pain in his left knee, however, had become worse. (<u>Id.</u>) Because of this pain and associated weakness, a MRI scan of his knee was to be scheduled. (<u>Id.</u>) A recent test had confirmed that Plaintiff had diabetes mellitus. (<u>Id.</u>) He was educated on the diabetes, told to check his "finger sticks" daily and keep a diary for a month, prescribed Meformin, given a diabetic diet, and advised about the need to lose weight. (<u>Id.</u>) A foot examination revealed mild diminution ankle jerks suggestive of early diabetic neuropathy. (<u>Id.</u>) Plaintiff was scheduled for a sleep study. (<u>Id.</u>) An MRI of his left knee revealed a small to mild size joint effusion and chondromalacia patella, or a softening of the articular cartilage of the kneecap. (<u>Id.</u> at 233.)

At the next month's visit, Plaintiff's diabetes was described as being under "excellent control." (<u>Id.</u> at 221.) His knee pain had improved with the Lorcet. (<u>Id.</u>) The pain was present at night, however, and Plaintiff wanted to increase the Lorcet to four times a day. (<u>Id.</u>) His prescription was changed accordingly. (<u>Id.</u>) He was advised to participate in

physical therapy; he declined.  (Id.)  The sleep study had confirmed sleep apnea; his CPAP was to be titrated at the sleep laboratory.  (Id. at 221, 231-32.)

At his next, January 2004, visit, Plaintiff's diabetes was again described as being under excellent control.  (Id. at 220.)  His blood pressure, however, was not so well controlled.  (Id.)  His medication to control it was increased.  (Id.)  The Lorcet was "working well" on his knee and back pain.  (Id.)  At his March visit, his pain and his diabetes continued to respond to their respective medication and dietary regimens.  (Id. at 219.)  His CPAP machine had not yet been retitrated.  (Id.)  As of Plaintiff's next, April visit, the machine had been retitrated.  (Id. at 218.)  Plaintiff was using it only a few hours a night and was, consequently, not receiving its full benefit.  (Id.)  He was encouraged to use it regularly through the night.  (Id.)  Plaintiff was also encouraged to give up cigarette smoking in order to lower his cholesterol.  (Id.)  His hypertension was stable.  (Id.)  It was also noted that Plaintiff had chronic low back pain and arthritis in his left knee joint, both resulting in "significant limitations."  (Id.)  Plaintiff's only complaint at his May visit to Dr. Jalal was of a severe toothache.  (Id. at 217.)

When Plaintiff next saw Dr. Jalal, in July, the primary concern was with the titration of the CPAP machine.  (Id. at 216.)  Complaining of problems going to sleep with the machine on, he requested a sleeping pill.  (Id.) He was given a prescription for one and advised to have the machine redialed.  (Id.)  His problems with insomnia were described in August as being resolved.  (Id. at 215.)  He continued to have dental problems.  (Id.)  In September, Plaintiff reported he was doing "fairly well with his low back pain."  (Id. at 214.)

For the past five days, he had had nasal stuffiness, drainage, a cough, and chest tightness with coughing. (<u>Id.</u>) His use of Advair was reinforced, and he was advised to use Albuterol every four hours as needed for the cough as well. (<u>Id.</u>) In October, Plaintiff reported that he was doing "fairly well." (<u>Id.</u> at 213.) With the exception of his cholesterol levels and hypertension, his other impairments were under control. (<u>Id.</u>) His hypertension was an issue because he had run out of his medication. (<u>Id.</u>) Another medication was prescribed for control of his cholesterol; he was again encouraged to stop smoking. (<u>Id.</u>) This advice and advice to walk 10 minutes in the morning and again in the evening was repeated in December. (<u>Id.</u> at 212.) His diabetes and chronic low back pain were again stable. (<u>Id.</u>) He had been taking a sleeping pill at night and had been sleeping better. (<u>Id.</u>) He did not feel "overly depressed," although he was "extremely stressed out and very crysome" because his mother was in the hospital with cervical cancer. (<u>Id.</u>)

At a follow-up visit in January 2005, Plaintiff's diabetes and low back pain continued to be under control. (<u>Id.</u> at 211.) The next month, Plaintiff reported doing well; he had no new complaints. (<u>Id.</u> at 210.) A few weeks later, a PFT report included the words "[e]ssentially normal study." (<u>Id.</u> at 229.) The doctor, Karthik P. Mahadevan, M.D., crossed that out and printed "early airways obstruction." (<u>Id.</u>)

In March, he reported having a lot of back spasms. (<u>Id.</u> at 209.) The Flexeril did not appear to be helping any longer; it was replaced with Skelaxin. (<u>Id.</u>) He had exertional shortness of breath, but not any daytime fatigue. (<u>Id.</u>) He continued to smoke at least 45 packs of cigarettes a year. (<u>Id.</u>) He was again advised to stop smoking to lower his

cholesterol levels. (Id.) Due to the uncertain results of the previous test, a PFT was to be performed the next month to assess whether he had an underlying obstructive lung disease. (Id.) The PFT had not yet been scheduled when Plaintiff next saw Dr. Jalal on April 4. (Id. at 199.) He had been having problems with his feet. (Id.) Shoes that had been prescribed because of his diabetes were wearing out; a new pair was prescribed. (Id.) A test revealed that he had bilateral peripheral neuropathy, especially in his heels. (Id.) Weight loss was emphasized. (Id.)

A six-minute walk test was performed on April 5. (Id. at 227.) Plaintiff reported having some back and knee pain during the walk. (Id.) He also had exertional dyspnea, or shortness of breath; it was attributed to poor exercise tolerance. (Id.) The PFT and another walk test were both performed on April 15. (Id. at 204, 206-07.) Plaintiff's weight was 270 pounds. (Id. at 206.) He had been a smoker since 1961. (Id.) Dr. Jalal subsequently diagnosed him with mild COPD with "significant reversible element." (Id. at 205.) Asthmatic bronchitis was a possible diagnosis. (Id.) Plaintiff walked 1,400 feet during the six-minute walk test. (Id. at 203.) His pulse stayed within a normal range during that period. (Id.) On another test results form, Plaintiff's weight is listed as 270 pounds; however, a notation reads that his actual weight was 230 pounds. (Id. at 202.) At his May visit to Dr. Jalal, Plaintiff described his back pain as a two or three on a ten-point scale. (Id. at 198.) The base of his right thumb was swollen; he had accidentally hit it with a hammer when doing some work at home. (Id.)

Plaintiff also submitted a "Medical Source Statement Ability to Do Work-Related Activities (Physical)."[7] (Id. at 144-45.) He was assessed as having the ability to occasionally lift less than ten pounds, to stand or walk less than two hours in an eight-hour workday, and to sit only if he could periodically alternate between standing and sitting. (Id. at 144.) Notations at the end of the form read that Plaintiff had degenerative joint disease of the lumbar spine and left knee. (Id. at 145.) He was moderately obese, making it difficult for him to treat. (Id.) He had sleep apnea and was on a narcotic regimen for pain control. (Id.) He also had hypertension and depression. (Id.)

Crystal Thele, a counselor with the State of Missouri's Section of Disability Determinations completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in October 2004. (Id. at 170-78.) She listed sleep apnea as the primary diagnosis; a mild disc bulge at L4-L5, and degenerative disc disease of the lumbar spine as an additional alleged impairment. (Id. at 170.) She assessed Plaintiff's exertional limitations as being able to occasionally lift 50 pounds, to frequently lift 25 pounds, and to stand, walk, or sit for 6 hours during an 8-hour workday. (Id. at 171.) He had no manipulative, postural, visual, or communicative limitations. (Id. at 173-75.) His only environmental limitation was a need to avoid concentrated exposure to "fumes, odors, dusts, gases, poor ventilation, etc." (Id. at 175.)

---

[7]The signature of the person completing the form is illegible; also illegible is the year in which the form was signed. The medical records of Dr. Jalal indicate that it was his signature and the date was April 14, 4004. (Id. at 218.)

The same month the PRFCA was completed, James M. Spence, Ph.D., completed a Psychiatric Review Technique form ("PRTF"), noting that Plaintiff had an affective disorder, specifically, a history of major depression, but concluding that the disorder had not resulted in any restrictions in his activities of daily living and or his ability to maintain concentration, persistence, and pace. (Id. at 156, 159, 166.) The disorder also did not cause any repeated episodes of decompensation of any duration. (Id. at 166.) It did, however, result in some mild difficulties in maintaining social functioning. (Id.)

### The ALJ's Decision

Noting that Plaintiff had previously applied for DIB and SSI, see note 3, above, and that all relevant evidence would be considered regarding his eligibility from the date of that prior decision to December 31, 2004, the date he was last insured, the ALJ summarized that evidence and found that Plaintiff had lumbar degenerative joint disease, left knee degenerative joint disease, COPD with exertional dyspnea, obstructive sleep apnea, obesity, and non-insulin dependent diabetes mellitus with peripheral neuropathy. (Id. at 15, 16-17.) These impairments were severe. (Id. at 18.) Plaintiff's depression was episodic in nature and corrected or controlled by medication; it was not severe. (Id.) His severe impairments, either individually or in combination, did not medically equal or meet an impairment of listing-level severity. (Id.) Moreover, "[t]here was no evidence of nerve root irritation of his lumbar spine, with no weakness, sensory loss or reflex loss. His subjective complaints of leg weakness are not credible. He is able to walk without using a cane, crutch or walker. His breathing is mildly impaired, but not the level required . . ." (Id.)

The ALJ next addressed the question of Plaintiff's RFC.  (Id.)  After outlining the factors to be considered when assessing Plaintiff's credibility, the ALJ found that (a) his allegations of disabling breathing problems were discounted given his lack of effort to stop smoking, although he had been told to by his treating physician; (b) his allegations of back pain and knee pain were discounted given his weight and lack of exercise, both of which he had been told contributed to his deteriorating physical condition; (c) his work history cast doubt on his credibility; and (d) his impairments existed when he was working and the record did not indicate that they were deteriorating or different than those in September 1998,[8] his alleged disability onset date.  (Id. at 19.)  The ALJ also discounted the opinions of Dr. Jalal, noting that (a) he checked boxes off of a form and (b) his treatment notes encouraged Plaintiff to be more active; linked Plaintiff's problems to his weight, lack of physical activity, and failure to stop smoking; and indicated that Plaintiff's pain was generally controlled with medication and that his breathing problems responded to medication and use of the CPAP machine.  (Id. at 20.)

Consequently, the ALJ concluded, Plaintiff had the RFC to occasionally lift no more than 20 pounds, frequently lift no more than 10 pounds, and sit, stand, or walk, off and on, for 6 hours in an eight-hour work day, with a need to alternate sitting and standing.  (Id.)  He also needed to avoid polluted work environments.  (Id.)  Although Plaintiff could not return to his past relevant work, the credible testimony of the VE established that there were jobs

_____

[8]On the first page of his decision, the ALJ had cited "1999" as the year of Plaintiff's alleged disability onset date.  The discrepancy is not relevant.

existing in significant numbers in the state and national economy that he could perform. (Id. at 21-22.) He was not, therefore, disabled within the meaning of the Act.

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have

no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not

require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. <u>See</u> **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d

1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court

may not reverse that decision merely substantial evidence would also support an opposite

conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently."

**Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the agency's findings, the [Court] must

affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000)

(alteration added).

## Discussion

Plaintiff argues that the ALJ fatally erred when not giving Dr. Jalal's Medical Source

Statement ("MSS") its proper weight and improperly interpreted the medical records to

support his decision rather than Dr. Jalal's. The Commissioner disagrees.

"'The [social security] regulations provide that a treating physician's opinion . . . will

be granted 'controlling weight' provided the opinion is 'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir.

2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in

original). Accord **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**,

421 F.3d 785, 790 (8th Cir. 2005); **Reed v. Barnhart**, 399 F.3d 917, 920 (8th Cir. 2005).

See also **Hacker v. Barnhart**, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's

opinion is generally given controlling weight, but is not inherently entitled to it."). The

longer a claimant's physician has treated him and the more times, the more weight is given

to that physician's opinion. 20 C.F.R. § 404.1527(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight is given to that physician's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). Conversely, "[a] treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." **Hacker**, 459 F.3d at 937 (alteration added). See also **Guilliams v. Barnhart**, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.").

Clearly, Plaintiff would be disabled within the meaning of the Act if Dr. Jalal's MSS statement were given controlling weight. For the reasons set forth below, however, the ALJ did nor err by not doing so.

Dr. Jalal completed the MSS in April 2004, four months before Plaintiff filed his pending applications, one month before his prior ones were denied, and after having treated Plaintiff since October 2003 and for seven visits. The first of those visits was an assessment of Plaintiff's various complaints, the tests undergone, and the treatment regimens tried. An x-ray of his left knee and an MRI of his lumbar spine revealed only minor impairments. At the second visit, Lorcet was prescribed. At the third visit, Plaintiff reported that his pain was markedly improved on the Lorcet. He was told to lose weight. An MRI of his left knee was taken, revealing only minor impairments. At the fourth visit, Plaintiff's diabetes was

described as being under excellent control; his knee pain had improved. Plaintiff was advised to participate in physical therapy. At his fifth visit, the Lorcet was described as working well on his knee and back pain. At his sixth visit, it was noted that Plaintiff's pain continued to respond to medication. At the seventh visit, the same day on which Dr. Jalal completed the MSS, it was noted that his chronic low back pain and arthritis in his left knee caused him significant limitations. This is the first mention in Dr. Jalal's records of any limitations. Moreover, this isolated observation is not supported by any testing of Plaintiff's range of motion and appears to be based on Plaintiff's complaints. The observation did not result in any change in his medication nor in any other alteration in his treatment regimen. Indeed, the next time Plaintiff's back pain is cited in Dr. Jalal's treatment notes was at his tenth visit, in September 2004, when Plaintiff reported he was doing "fairly well" with his back pain. This report was repeated at the next visit. Only his hypertension and cholesterol were not under control. He had, however, run out of hypertension medication. He was also instructed to walk, stop smoking, and lose weight.

It is this inconsistency between Dr. Jalal's treatment notes and his conclusions on the MSS that undermined the weight to be given the latter. The ALJ's characterization of the MSS as being a checklist form was not inaccurate. "An MSS is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of 'objective medical evidence.'" **Reed**, 399 F.3d at 917. This characterization does not translate, as Plaintiff's argument implies, into a rejection of the opinions reported on the MSS based only on the form being used. As noted by Plaintiff, the Eighth Circuit Court of

Appeals has "never upheld a decision to discount an MSS on the basis that the 'evaluation by box category' is deficient *ipso facto*." **Id.** at 921.  The Eighth Circuit has upheld a decision to discount an MSS including limitations never mentioned in the treatment notes or supported by any objective testing or reasoning, **Hogan v. Apfel**, 239 F.3d 958, 961 (8th Cir. 2001), and a decision to discount an MSS that was "'without explanation or support from clinical findings'" and was not consistent with the completing physician's own treatment notes, **Strongson**, 361 F.3d at 1071.  The basis for the ALJ's discounting the MSS was its lack of support from clinical findings and the inconsistency between the MSS and Dr. Jalal's own treatment notes.  See **Holmstrom**, 270 F.3d at 720-21 (8th Cir. 2001) (ALJ did not err in discounting doctor's opinion about claimant's RFC; opinion was noted on checklist form, based only on relatively short-term relationship, and was inconsistent with medical evidence as a whole).

Additionally, some of the impairments noted by Dr. Jalal at the end of the MSS as the cause for Plaintiff's limitations are controllable or amenable to treatment and, therefore, do not support a finding of disability.  See **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  His sleep apnea, hypertension, diabetes, and back and knee pain were all described at various times in Dr. Jalal's treatment notes as being under control when Plaintiff was following the prescribed treatment regimen.  He did not follow Dr. Jalal's instructions to stop smoking, exercise, and lose weight.  "'[F]ailure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application of benefits.'" **Id.** (quoting Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)) (alteration added).  See also

**Wheeler v. Apfel**, 224 F.3d 891, 895 (8th Cir. 2000) (affirming denial of benefits to claimant who smoked two packs of cigarettes a day despite complaints of asthma and treating physician's instructions to stop); **Kisling**, 105 F.3d at 1257 (affirming denial of benefits to claimant with respiratory problems related to smoking habits).

In the MSS, Dr. Jalal also cited Plaintiff's depression. When Plaintiff first consulted Dr. Jalal he gave a history of depression and reported he was on Serzone "with stable control of some of his symptoms." (R. at 225.) Dr. Jalal attributed the depression to Plaintiff's untreated sleep apnea. Plaintiff's sleep apnea was subsequently treated. The next time depression is mentioned in Dr. Jalal's treatment notes is eight months after he completed the MSS and is in the context of Plaintiff's mother being hospitalized with cancer. Plaintiff was not then feeling "overly depressed." When Plaintiff listed his medications in May 2005, more than a year after the MSS was completed, they did not include the medication he told Dr. Jalal at his first visit that had been previously prescribed for his depression and Dr. Jalal's notes do not refer to any new medication being prescribed for depression. Again, Dr. Jalal's treatment notes are inconsistent with his conclusions on the MSS. See, e.g., **Tindell v. Barnhart**, 444 F.3d 1002, 1007 (8th Cir. 2006) (affirming ALJ's finding that as to severity of claimant's depression; depression appeared to be situational and claimant had "little" history of medication for depression or anxiety).

For the foregoing reasons, the ALJ did not err in not giving Dr. Jalal's MSS controlling weight.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of March, 2007.